# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON

**UNITED STATES OF AMERICA**

**v.**                              **CRIMINAL NO. 2:24-cr-00051**

**JESUS EMMANUEL DAVIS**

## SENTENCING MEMORANDUM OF THE UNITED STATES

COMES NOW the United States of America, by Lesley Shamblin, Assistant United States Attorney for the Southern District of West Virginia, and pursuant to this Court's order entered on September 16, 2024 (ECF No. 40), hereby files this memorandum in aid of sentencing in the above-styled case. For the reasons explained herein, the United States respectfully requests that this Court impose a sentence at the bottom of the Guidelines range of 100–125 months of imprisonment.

## I.   BACKGROUND

On July 3, 2024, Jesus Emmanuel Davis ("Defendant"), pursuant to a written plea agreement, pled guilty to Count One of the Indictment in this case, which charged him with distribution of protonitazene and isotonitazene, both Schedule I controlled substances, in violation of 21 U.S.C. § 841(a)(1). (ECF Nos. 13, 33, 34, 35.) The Presentence Investigation Report ("PSR") prepared

by the United States Probation Office for the Southern District of West Virginia calculated Defendant's total offense level at twenty-seven and his criminal history category at IV, resulting in a Guidelines range of 100–125 months of imprisonment. (PSR ¶¶ 40, 46, 70.) The United States agrees with this calculation.

## II.  OUTSTANDING OBJECTIONS TO PSR

The United States anticipates that, as outlined in the Addendum to the PSR, Defendant will contest the PSR's inclusion of the 426.23 grams of fentanyl found in a vehicle parked at Defendant's residence on June 8, 2023, as relevant conduct attributable to Defendant. (PSR ¶ 18; Addendum.) The PSR correctly attributed that fentanyl to Defendant pursuant to U.S.S.G. §1B1.3(a)(2), which instructs the sentencing court to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." See United States v. Crawford, 734 F.3d 339, 342 (4th Cir. 2013).

Defendant was a drug dealer, and -- as drug dealers tend to do -- he both sold drugs and kept them at his house to sell later. He pled guilty to selling protonitazene and isotonitazene pills during a controlled buy that occurred on April 7, 2023. (PSR ¶¶ 9–11.) Over the next two months, law enforcement conducted seven other controlled buys involving those same pills. Unlike the April 7, 2023 controlled buy, Defendant did not directly distribute the

pills to the confidential informant during the seven other controlled buys, but at least some of the pills the confidential informant bought came from Defendant's house. The last controlled buy, which occurred on May 31, 2023, involved both pills and powder fentanyl that came from Defendant's house. (PSR ¶¶ 12-15.) Curon Cameron Cordon ("Cordon"), who distributed the drugs to the confidential informant during the other controlled buys, told the confidential informant that day "that individuals inside of [Defendant's] residence were wearing masks and gloves while cutting the suspected fentanyl from the brick." (PSR ¶ 14.)

Approximately a week later, on June 8, 2023, law enforcement executed a search warrant at Defendant's house. (PSR ¶¶ 16-18.) During the search, Defendant and his girlfriend were standing outside the house when an officer heard Defendant ask his girlfriend several times to "get the car seat." (PSR ¶ 18.) Officers did not find a car seat while searching Defendant's house, nor did they see one inside the car parked in Defendant's driveway. Defendant's girlfriend, who seemed confused by Defendant's request, told officers that the car did not run, and she did not remember the last time it was driven. (PSR ¶ 18.) When officers approached the car to look inside, Defendant's demeanor changed, and he asked the officers why they were interested in the car. Officers saw a bag containing suspected marijuana residue through

the car's window and towed the car to another location so it could be searched. (PSR ¶ 18.) Officers unlocked the car using a key found in Defendant's house, in a bedroom used by Jomo Smith, Jr. ("Smith"), and found documents inside the car indicating it belonged to Smith. In the trunk of the car, officers found a backpack containing more than 400 grams of fentanyl, portioned into fifteen individual bags.

After the search of his house, Defendant was arrested. (PSR ¶ 19.) He declined to be interviewed and was not questioned by officers after his arrest. (PSR ¶ 19.) However, while he was in the interview room, Defendant made an inculpatory statement indicating that the pills law enforcement found in his house belonged to him, but not anything else. (PSR ¶ 19.)

These facts show that Defendant constructively possessed the fentanyl found in the car with the intent to distribute it. "Constructive possession requires ownership, dominion, or control over the contraband or the premises . . . in which the contraband was concealed and knowledge of the presence of the contraband." United States v. Moody, 2 F.4th 180, 189 (4th Cir. 2021) (internal quotation marks omitted). Defendant's behavior while the search warrant was being executed indicates that he both knew the fentanyl was in the car and intended to exercise some degree of control over it. His instruction to his girlfriend about the car seat was

clearly a coded message referring to the fentanyl, as there was no car seat in the car or in Defendant's house. Defendant plainly needed to signal to his girlfriend to get something out of the car, but aside from the fentanyl, there was nothing of value in the car. Even though the car belonged to Smith, who had the key in his bedroom, the car was inoperable and parked in the driveway of Defendant's residence, where he and Smith both lived. The presence of such a large amount of fentanyl in a car that did not run and had not been driven recently suggests that the car was being used to store drugs. In fact, the fentanyl found in the car was likely the same batch -- bagged and ready for sale -- that Cordon saw being cut from the brick at Defendant's house barely a week earlier. Defendant's statement in the interview room that he only had anything to do with the pills found in his house further shows that he knew officers would find other contraband during the search.

Defendant's possession of the fentanyl with the intent to distribute it is part of either the same course of conduct or common scheme or plan as his distribution of protonitazene and isotonitazene pills on April 7, 2023. "[I]n many, if not most, cases one drug offense will qualify as relevant conduct to another drug offense involving a different drug." United States v. Phillips, 955 F. Supp. 622, 626 (W.D. Va. 1997). "A defendant's

5

possession or distribution of types and quantities of drugs not specified in the account of conviction is to be considered for sentencing purposes . . . if it is part of the same course of conduct, common scheme, or plan as the offense of conviction." United States v. Williams, 977 F.2d 866, 870 (4th Cir. 1992).

"For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. §1B1.3 cmt. n.5(B)(i). Throughout the course of the investigation that led to this case, Defendant was conspicuously involved in the illicit drug trade. He supplied Cordon with the drugs that Cordon then sold to the CI during the controlled buys. The last of those controlled buys, which occurred roughly a week before the search warrant was executed at Defendant's house, involved powder fentanyl that Cordon obtained from Defendant's house. Cordon told the CI that there were people inside the house cutting the fentanyl from the brick. Only Defendant and Smith lived there at the time, and it is incredibly unlikely that Defendant was wholly unaware that such activity was going on right under his nose. The simpler explanation is that Defendant was a willing participant engaged in a common scheme or plan to sell drugs, and he traded in opiate pills and powder fentanyl.

"Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing serious of offenses." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii). The factors relevant to that determination "include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Id. Defendant's sale of pills to the CI occurred only two months before the search warrant was executed at his house. Within that two months, the CI continued to purchase those same pills from Cordon on a weekly basis, and Cordon got the pills from Defendant's house. Cordon also got powder fentanyl from that house just prior to the execution of the search warrant there. Defendant's distribution of the pills in April 2023 and his possession of the fentanyl with the intent to distribute it in June 2023 are clearly part of his ongoing involvement in the drug trade.

To conclude, whether Defendant's possession of the fentanyl with the intent to distribute it is part of either the same course of conduct or common scheme or plan as his distribution of protonitazene and isotonitazene pills on April 7, 2023, the PSR properly included the fentanyl found in the vehicle parked in

Defendant's driveway on June 8, 2023, as relevant conduct pursuant to U.S.S.G. §1B1.3(a)(2).

## III. **18 U.S.C. § 3553(a) SENTENCING FACTORS**

In assessing the 18 U.S.C. § 3553(a) sentencing factors, the United States respectfully requests that this Court consider the following:

### (1) **Nature and Circumstances of the Offense.**

In April 2023, officers with the Charleston, West Virginia, Police Department ("CPD") began investigating Cordon for selling what he claimed were fentanyl pills. (PSR ¶ 8.) Between April 7, 2023, and May 31, 2023, officers with CPD and the Bureau of Alcohol, Tobacco, Firearms and Explosives conducted a total of eight controlled purchases of suspected fentanyl pills (and, during five of those controlled purchases, guns in addition to pills) from Cordon using a confidential informant ("CI"). (See PSR ¶ 11.) Although the CI arranged to purchase the pills from Cordon, Cordon sent Defendant in his place on April 7, 2023. (PSR ¶¶ 9-10.) That day, Defendant sold the CI a total of five pills in exchange for $125. (PSR ¶ 9.)

The pills were counterfeit pressed pills with the same markings as 30mg oxycodone pills. (See PSR ¶ 10.) The pills were lab-tested after being seized and determined to contain not fentanyl or oxycodone but protonitazene and isotonitazene, both

8

Schedule I synthetic opioids more potent than fentanyl. (PSR ¶¶ 10, 26.)

During the remaining seven controlled buys, law enforcement continued to purchase those same pills from Cordon. (PSR ¶ 11.) Cordon drove the CI to Defendant's residence to obtain the pills during the final four controlled buys. On May 31, 2023, Cordon drove the CI to Defendant's residence, went inside alone, and came back out with thirteen pills. (See PSR ¶ 13.) Cordon drove away from the house, but on the way down the hill, he called someone to ask if the fentanyl was ready. (See PSR ¶ 14.) Then, Cordon turned the car around, drove back to Defendant's house, again went inside alone, and returned to the car with two plastic bags of suspected fentanyl. (See PSR ¶ 14.) Cordon told the CI that people were inside the house cutting the fentanyl from the brick. (PSR ¶ 14.) He gave the CI a small amount of the fentanyl, which was later lab-tested and confirmed to contain fentanyl. (PSR ¶ 15.)

Based on the controlled purchases, law enforcement obtained a search warrant for Defendant's residence, which was executed on June 8, 2023. (PSR ¶ 16.) During the search, law enforcement found a bag of cash on the couch near where Defendant was standing and nearly 100 of the same pills bought during the controlled buys in the pocket of a jacket hanging in Defendant's bedroom closet. (PSR ¶ 17.) Law enforcement also found approximately 426 grams of

fentanyl in the trunk of a car parked in the driveway of the residence. (PSR ¶ 18.)

Defendant was arrested after the search warrant was executed. (PSR ¶ 19.) Although he declined an interview, he claimed ownership of the pills found inside the house. (PSR ¶ 19.)

**(2)**   **History and Characteristics of the Offender.**

Defendant is twenty-five years old. (PSR ¶ 59.) When he was very young, his father went to prison, and he and his family moved from New York to South Carolina. (PSR ¶¶ 54, 56, 58.) He began abusing marijuana when he was thirteen years old. (PSR ¶ 61.) At age sixteen, before finishing high school, Defendant was arrested after he stole $80 from a twelve-year-old by shoving the child to the ground. (PSR ¶¶ 42, 62.) He eventually pled guilty to assault and battery as a result of his conduct and was sentenced to two years of incarceration. (PSR ¶ 42.) Less than a year after that arrest, Defendant was arrested again, this time after he and a co-defendant took $215 and other valuables from a house while a third co-defendant held the home's occupants at gunpoint. (PSR ¶ 43.) Defendant later pled guilty to robbery and was sentenced to six years of incarceration. (PSR ¶ 43.) In the meantime, he was arrested a third time and convicted after a bench trial of threatening the life of a person or family of a public employee. (PSR ¶ 44.) He was sentenced to thirty days in jail. (PSR ¶ 44.)

Between 2018 and 2022, after his release from incarceration, Defendant spent time in West Virginia and in New York. (See PSR ¶¶ 45, 49, 50, 58, 62, 64.) He obtained his GED in West Virginia in 2019. (PSR ¶ 62.) In 2020 and 2021, Defendant worked for Bullock Properties in Charleston, West Virginia. (PSR ¶ 64.) While living in West Virginia, Defendant was involved in a verbal altercation with a woman, broke her phone, dragged her outside an apartment while she was nude, bit her, and cut her back with his belt. (PSR ¶ 45.) He pled guilty to domestic battery. (PSR § 45.)

In 2022, Defendant worked for the Federal Emergency Management Agency in Staten Island, New York. (PSR § 64.) Later that year, Defendant moved to Charleston, West Virginia, where he has lived since that time. (PSR ¶ 57.) He has worked off and on at a restaurant and a moving service owned by his extended family. (PSR ¶ 63.) However, he was not employed at the time of his arrest in this case and claimed to be financially supported by his girlfriend. (PSR ¶ 65.) When he was arrested, Defendant was living with his girlfriend and their young child in Rand, West Virginia. (PSR ¶¶ 57, 58.) Defendant maintains a close relationship with his mother, who resides in South Carolina, and has family support. (PSR ¶¶ 54, 56.)

11

**(3) <u>Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Provide Adequate Deterrence, and Protect the Public.</u>**

Defendant has pled guilty to a serious offense made all the more serious by the nature of the drugs he distributed. Defendant was selling counterfeit pressed pills, with coloration and markings intended to make them look like legitimate pharmaceuticals. Although the pills were marketed as fentanyl pills, they actually contained protonitazene and isotonitazene -- two synthetic opioids with effects on the human body similar to those of fentanyl but with a significantly higher potency. That high potency results in an increased risk of overdose and death. The substances in the pills Defendant sold are so new to the illicit drug trade in this District and in the United States that the law enforcement officers involved in this investigation -- who regularly work drug cases -- had never encountered them before. In reality, Defendant had no idea what he was selling and no regard for what it would do to the people he sold it to.

Defendant did not use the pills himself and appears to have sold drugs solely for financial gain. That he was employed only sporadically yet had a large amount of cash in his home (in addition to drugs) when law enforcement executed a search warrant there indicates that the majority of his income was derived from drug dealing. Defendant was no small-time dealer, either, as

illustrated by the incredibly large amount of powder fentanyl --
almost a pound, enough to kill more than 100,000 people, according
to the Drug Enforcement Administration -- that was found in the
car parked in his driveway.

A sentence at the bottom end of the Guidelines range of 100-
125 months of imprisonment would adequately reflect the
seriousness of Defendant's conduct and the immense danger it posed
to the public. The sentence would also be the longest Defendant
has ever served and would ideally deter him from continuing to
engage in criminal behavior in the future in a way that his
previous sentences have not. Defendant has a considerable criminal
history, marked by multiple instances of violence toward others,
for someone who is only twenty-five years old.

A sentence at the bottom of the Guidelines range would also
be sufficient but not greater than necessary to punish Defendant
for his conduct and deter other would-be drug dealers from engaging
in the same conduct. Although Defendant's role in the investigation
that led to this case is significant in that he was the supplier
of the drugs Cordon sold to the CI, the United States is mindful
that Cordon -- who put not only those drugs out into the community
but numerous guns as well -- has a higher culpability than
Defendant. Accordingly, the United States believes that Cordon

deserves a longer sentence of imprisonment than Defendant does and will be requesting such a sentence in Cordon's case.

**(4) Available Sentences and Applicable Guidelines Range.**

The statutory maximum term of imprisonment is twenty years, with no applicable mandatory minimum. If this Court agrees with the total offense level and criminal history category calculations in the PSR, Defendant's Guidelines range is 100–125 months of imprisonment.

**(5) Restitution.**

There is no identifiable victim entitled to restitution in this case. The United States does not intend to seek community restitution due to Defendant's limited financial resources beyond property subject to forfeiture.

**IV. WITNESSES**

The United States anticipates calling two witnesses during the sentencing hearing to testify regarding the PSR objection detailed in Part II of this sentencing memorandum.

**V. CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court impose a sentence at the bottom of the Guidelines range of 100-125 months of imprisonment.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

/s/Lesley Shamblin
LESLEY SHAMBLIN
Assistant United States Attorney
WV Bar No. 12975
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: Lesley.Shamblin@usdoj.gov

# CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "SENTENCING MEMORANDUM OF THE UNITED STATES" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing and by email this 2nd day of October, 2024, to:

David O. Schles
Law Office of David Schles
815 Quarrier Street, Suite 306
Charleston, WV 25301
Email: schleslaw@gmail.com

/s/Lesley Shamblin
LESLEY SHAMBLIN
Assistant United States Attorney
WV Bar No. 12975
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: Lesley.Shamblin@usdoj.gov